# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

K&F RESTAURANT HOLDINGS, LTD.,
d/b/a IZZO'S ILLEGAL BURRITO, ET
AL.                                              CIVIL ACTION

VERSUS                                           NO. 16-293-JWD-EWD

DONALD J. ROUSE, JR., ET AL.

## RULING AND ORDER

This matter is before the Court on four Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The first was filed by Donald J. Rouse, Jr. ("Rouse, Jr."); Donald J. Rouse, Sr.; Thomas B. Rouse; Allison Rouse Royster; and Rouse's Enterprises, LLC ("Rouse's," and collectively "the Rouse Defendants"). (Doc. 148). Plaintiffs K&F Restaurant Holdings, Ltd. d/b/a Izzo's Illegal Burrito ("Izzo's"); K&F Restaurant Operations, LLC; G&O Pizza Holdings, Ltd., d/b/a LIT Pizza ("LIT Pizza"); G&O Restaurant Operations, LLC; Osvaldo Fernandez; and A. Gary Kovacs (collectively "Plaintiffs") oppose. (Doc. 164). The Rouse Defendants have filed a Reply in further support of their Motion. (Doc. 172).

The second Motion was filed by Victory Berryland, LLC ("Berryland"). (Doc. 139). Plaintiffs oppose, (Doc. 168), and Berryland has filed a Reply in further support of its Motion, (Doc. 170).

The third Motion was filed by Stephen Keller and Creekstone Juban I, LLC ("Creekstone," and collectively "the Creekstone Defendants"). (Doc. 140). Plaintiffs oppose. (Doc. 165).

The fourth Motion was filed by Russell Mosely and Mosely Holdings, LLC (collectively, "the Mosely Defendants"). (Doc. 143). Plaintiffs oppose, (Doc. 163), and the Mosely Defendants have filed a Reply in further support of their Motion, (Doc. 171).

For reasons discussed below, the Motions will be granted, and this case will be dismissed in its entirety.

## I.    BACKGROUND

### A.  Plaintiff's Allegations

In September 2011, Jack Trueting, Rouse's "Director of Perishables," called Fernandez to say that Rouse's was "very impressed with Izzo's products" and was interested in franchising Izzo's burrito restaurants in Rouse's grocery stores. (Doc. 138 at 3). Izzo's declined. (*Id.*). Rouse, Jr., who manages Rouse's, then allegedly formed a "scheme" to steal Izzo's burrito recipes. (*Id.*). Specifically, in 2011, Rouse, Jr. "directed" some of his store managers in Lafayette, Louisiana to make an offer, "essentially a bribe," to Patrick Dartez, manager of an Izzo's in Lafayette, to "defect to Rouse's with Izzo's recipes." (*Id.*). Dartez accepted. (*Id.*). Following the success of the "scheme," Rouse's began selling burritos that were "very similar, if not identical," to Izzo's burritos in some of its stores. (*Id.* at 4). Plaintiffs contend that this constitutes illegal use of Izzo's trade secrets. (*Id.* at 5-6). Plaintiffs also contend that Rouse's uses the phrase "build your own" in connection with its burritos and that this phrase is very similar to "roll your own," which Izzo's uses in connection with its burritos. (*Id.* at 9).

Additionally, in July 2011, Izzo's sought to "acquire a restaurant" at Juban Crossing, a commercial development in Livingston, Louisiana managed by Keller and developed by Creekstone. (*Id.* at 4). In 2012, Izzo's, Keller, and Creekstone signed a letter of intent pursuant to which Izzo's was to lease space at Juban Crossing. (*Id.*). However, in a lease agreement recorded in June 2013, Rouse's agreed to be the anchor tenant at Juban Crossing. (*Id.*; *see also* Doc. 138-5 at 1). One of the conditions of the agreement was that no portion of Juban Crossing would be leased or sold to Izzo's, "K&F Restaurant Management, LLC," or any affiliate of either.

(Doc. 138 at 1; *see also* Doc. 138-5 at 4). According to Plaintiffs, Rouse, Jr. justified the condition in "interstate phone calls" occurring in 2012, stating that Izzo's sold "substandard" products and was "litigious." (Doc. 138 at 5). Creekstone refused to lease space to Izzo's, allegedly resulting in "millions of dollars" in lost profits to Izzo's. (*Id.*).

The operative Second Amended Complaint alleges seven "counts." (*Id.* at 6-20). Count I is against Rouse, Jr. for violating the conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). (*Id.* at 6). Plaintiffs contends that Rouse, Jr. "conspired to commit three RICO violations against Izzo's," *i.e.*, violating the Travel Act via the scheme to steal Izzo's recipes, committing wire fraud by stating in phone calls that Izzo's was litigious and sold substandard products, and illegally stealing and using trade secrets. (*Id.* at 6).

Count II is a claim for "Conspiracy To Violate La. Civ. Code Arts. 2324, et seq. as to all Defendants." (*Id.* at 6-7). Plaintiffs claim that their factual allegations "set forth a civil conspiracy set forth among the defendants to exclude and group boycott the plaintiffs from highly desirable developments." (*Id.* at 7). Plaintiffs also contend that "each of the defendants' name[d] herein are made in act of the furtherance of the conspiracy by rejecting Izzo's[,] Lit and any other development created by Fernandez and Kovacs." (*Id.*).

Count III alleges "Product Defamation and Disparagement against the Rouse's Defendants." (*Id.* at 7). Plaintiffs claim that "Rouse's" made false statements concerning the quality of Izzo's products and its litigiousness to "several third parties but for certain to each of the co-conspirators herein, Juban, Keller, Long Farms, Mosely, and Berryland." (*Id.* at 7-8). Plaintiffs assert that these statements were false, as evidenced by Rouse's desire to franchise Izzo's restaurants and Izzo's decision not to assert claims against Rouse's when an Izzo's recipe book was recovered from a Rouse's store. (*Id.* at 8).

Count IV[1] alleges "Tortious Interference and Business Relations as to all Defendants." (*Id.* at 8). Plaintiffs contend that "[t]he various aforementioned acts and practices by the Rouse Group and co-conspirators have tortiously interfered and continue to tortiously interfere with lawful business relations between Izzo's and its partners and other developers." (*Id.*). This count also concerns the statements about Izzo's alleged litigiousness and substandard products. (*Id.*).

Count V asserts trademark infringement under La. Rev. Stat. 51:211 et seq. "as to Rouse's Defendants" based on the use of the "trade name" "build your own." (*Id.* at 9).

Count VI asserts a "Conspiracy under Sherman Act and Restraint of Trade in Transportation Market[,] 15 U.S.C.A. § 1, 35, 36 as to All Defendants." (*Id.* at 9-10). Plaintiffs contend that "Defendants have monopolized the Market Area in that it has [sic] power to dictate tenants of its preference and exclude competition in some or all of the Market Area" and have "acquired, exercised, and maintained its monopoly power willfully and intentionally by way of the acts set forth above." (*Id.* at 10). Plaintiffs similarly allege that Defendants have attempted to monopolize or conspired to monopolize the "Market Area." (*Id.*). Count VI states that "unlawful agreements [among the Defendants] are evidenced by, among other things, the leases, the deed, the economic interests of Defendants Rouse's, Keller, Juban, Mosely, Long Farms, and Berryland; the close relationships among Defendants; Defendants' concerns about the competitive threat that Izzo's application posed to the Defendants; the history and anticompetitive practices of Rouse's; and the timing of various anticompetitive actions taken by Rouse's, Keller, Juban, Mosely, Long Farms, and Berryland." (*Id.* at 11). Plaintiffs further contend that "Defendants have engaged in per se anticompetitive behavior, or, alternatively, anticompetitive behavior without procompetitive justification, that has unreasonably retrained trade in violation of Section 1 of the Sherman Act."

---

[1] The Second Amended Complaint contains two Count III's. This count and all subsequent counts are renumbered for clarity.

(*Id.*).  Plaintiffs contend that the product market for this "count" is the "retail food sale market," while the relevant geographic market is the state of Louisiana.  (*Id.*).

Count VII asserts a "Complaint for Violation of Federal and Louisiana Antitrust Laws, Unfair Practices, and Unfair Competition 15 U.S.C.A. § 1, 2, and 13 as to All Defendants."  (*Id.* at 14).  Plaintiffs define the "many" product markets for "retail food" as "(i) sale of food for cooking; (ii) the sale of partially prepared food which simply requires heating; (iii) the sale of pre-cooked food, ready to eat; (iv) the sale of pre-cooked food concentration on one type of food; (v) the sale of pre-cooked food with a variety of types of food; and (vi) the combination of selling un-cooked food requiring preparation and cooking along with pre-cooked foods, ready to eat."  (*Id.* at 15).  Plaintiffs define the "relevant geographic markets for retail food sales" as "the entire United States" and "the states commonly known as the Southeastern United States, including, but not limited to, Louisiana, Mississippi, Alabama and Florida."  (*Id.*).  Plaintiffs claim that barriers to entry are high given "[t]he high concentration in the Market Area, the sophisticated technology, large expenses, high capital costs, [and] relationship[s] with farmers and wholesalers."  (*Id.* at 16).  Plaintiffs contend that "Defendants" have engaged in refusal to deal and collusion with developers, constituting monopolization, attempt to monopolize, and conspiracy to monopolize; unreasonable restraint of trade; and "unfair competition."  (*Id.* at 16-19).

Attached to the Second Amended Complaint are numerous exhibits, including, *inter alia*, an affidavit by Fernandez stating that, in a March 2016 meeting, Russell Mosely expressed regret that he could not include an Izzo's in a development, but Rouse, Jr. had told Mosely that there had been an "incident" between Izzo's and Rouse's "years ago" and Izzo's would "never make a dollar off of [him]!"  (Doc. 138-6 at 1; *see also* Doc. 138-10 at 7 (Declaration of Covenants excluding "Any Izzo's" from a Mosely property)).  Also attached to the Second Amended Complaint is a

Notice of Lease between Berryland and Rouse's excluding "[a]ny Izzo's or similar burrito restaurant." (Doc. 138-12 at 6).

### B. Procedural History

This case was filed in state court in April 2016 and removed shortly thereafter. (Doc. 1). The initial Petition for Damages named the Rouse Defendants and raised RICO claims and state law claims for violations of Louisiana's Unfair Trade Practices and Consumer Protection Act ("LUTPA"), tortious interference with a contract, product defamation, civil conversion, trademark infringement, and conspiracy. (Doc. 1-1 at 2, 8-13). The Rouse Defendants moved for dismissal of Plaintiffs' state law claims, while Plaintiffs moved to remand. (Docs. 5, 7). The Court denied the Motion to Remand and granted in part and denied in part the Motion to Dismiss. (Docs. 26, 31). Specifically, the Court ruled that the LUTPA claim was untimely and dismissed it with prejudice. (Doc. 31 at 5-7, 14). The Court denied the Motion to Dismiss as to the trademark infringement claim, ruling that Plaintiffs had adequately pled a "protectable right" in the trade name "roll your own" and Rouse's violation of that right. (*Id.* at 12, 14). The Court dismissed the remaining state law claims with leave to amend as inadequately pled. (*Id.* at 7-11, 12-14). Plaintiffs moved for reconsideration and to recuse the then-assigned district judge. (Docs. 38-41).

Plaintiffs later filed an "Amended and Restated Complaint." (Doc. 70). This pleading named all of the defendants currently named (along with one other person) and raised RICO claims, federal antitrust claims, and state law claims for "wrongful conversion of proprietary information," conspiracy, product defamation and disparagement, tortious interference with business relations, trademark infringement, and violation of state antitrust law. (*Id.*). Several defendants moved to dismiss. (*See* Docs. 71, 78, 83).

The Court then denied the outstanding motions for reconsideration and to recuse. (Docs. 102, 117). Five days after reconsideration was denied, Plaintiffs again moved to disqualify the then-assigned district judge. (Doc. 118). Although that judge ruled that the basis upon which disqualification was sought, *i.e.*, a lawsuit brought by Plaintiffs' counsel, was "a transparent attempt to create bias and hostility in an effort to provoke disqualification," the Court granted the motion given that "the machinations to which Plaintiffs' counsel ha[d] resorted to poison and impugn the Court's impartiality" might cause a "thoughtful and objective observer" to question the Court's impartiality. (Doc. 133 at 8-9). The case was thereafter reassigned to this section of the Court.

Following the case's reassignment, the Court held a status conference and granted Plaintiffs' then-pending motion for leave to file a Second Amended Complaint. (Doc. 136; *see also* Doc. 95). The Court informed Plaintiffs' counsel that "this [was] the last amendment to the complaint that [would] be allowed by the Court." (Doc. 136 at 1). The outstanding Motions to Dismiss were denied without prejudice to renewal following the filing of the Second Amended Complaint. (*Id.* at 1-2). The Second Amended Complaint was filed on October 26, 2017.

## II.    GENERAL STANDARDS

In *Johnson v. City of Shelby, Miss.,* —— U.S. ——, 135 S. Ct. 346 (2014), the Supreme Court explained that "[f]ederal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S.Ct. at 346–47 (citation omitted).

Interpreting Rule 8(a), the Fifth Circuit has explained:

The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant

evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, 556 (2007) (emphasis in *Lormand*)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)]; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand, supra,* nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand,* 565 F.3d at 257; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.,* No. 10–00177, 2011 WL 938785, at *3

(W.D. La. Feb. 9, 2011) (citation omitted).

More recently, in *Thompson v. City of Waco, Tex.,* 764 F.3d 500 (5th Cir. 2014), the Fifth

Circuit summarized the standard for a Rule 12(b)(6) motion:

We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff . . . To survive dismissal, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff state a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (citations and internal quotations omitted).

## III. THE MOTIONS TO DISMISS

### A. The Rouse Defendants

#### 1. The Motion

In support of their Motion to Dismiss, the Rouse Defendants first argue that Plaintiffs' claims for "product defamation and disparagement" fail as vaguely pled and because the challenged statements concerning Izzo's alleged "litigiousness" and "substandard product" are non-actionable matters of opinion. (Doc. 148-1 at 5-6). They also note that defamation claims, like other tort claims, are subject to a one-year prescriptive period. (*Id.* at 5). They similarly argue that Plaintiffs' claim for tortious interference with business relations is conclusorily pled, is prescribed, and does not allege that the Rouse Defendants "acted improperly or with actual malice." (*Id.* at 6-8). The Rouse Defendants then argue that Plaintiffs' trademark infringement claim fails, as "build your own" is a common, descriptive, generic phrase unlikely to cause confusion and not subject to trademark protection. (*Id.* at 8-10). Next, they argue that Plaintiffs' state law conspiracy claims fail because there is no "underlying tort" nor any non-conclusory allegations of a conspiratorial agreement as to a particular unlawful outcome or result. (*Id.* at 10-11). With respect to Plaintiffs' RICO claim, the Rouse Defendants claim that Plaintiffs have failed to plausibly plead the elements of each predicate act alleged or a "pattern" of racketeering activity. (*Id.* at 11-12).

The Rouse Defendants characterize Plaintiffs' antitrust claims as "facially ridiculous" and "lack[ing] each and every component of a plausible claim under either federal or state antitrust law." (*Id.* at 13). First, they observe that Plaintiffs complain of being excluded from a few developments in Louisiana but define the relevant market as essentially all food sales throughout Louisiana, throughout the Southeastern United States, or throughout the whole of the United

States.  (*Id.* at 13-14).  The Rouse Defendants also argue that Plaintiffs fail to adequately plead "antitrust injury," *i.e.*, an injury to competition, not just to Izzo's, particularly given that Plaintiffs' competitors were allowed at some of the developments.  (*Id.* at 14-15).

The Rouse Defendants further argue that Plaintiffs' claims of a vertical price-fixing conspiracy or vertical concerted refusal to deal under Section 1 of the Sherman Act fail for failure to plead market power, particularly given the size of the market.  (*Id.* at 16-18).  They also claim that any additional conspiracy claims under 15 U.S.C. §§ 1, 35, or 36 must be dismissed as duplicative or meritless.  (*Id.* at 19).  The Rouse Defendants likewise argue that Plaintiffs' claims of monopolization, attempt to monopolize, and conspiracy to monopolize under Section 2 of the Sherman Act fail for failure to adequately allege market power or market share and specific intent to monopolize.  (*Id.* at 19-22).  The Rouse Defendants further argue that Plaintiffs fail to allege a "single element" of a claim under 15 U.S.C. § 13.  (*Id.* at 22).  The Rouse Defendants also contend that there is no private right of action for "unfair competition" under the Federal Trade Commission Act, and Plaintiffs' LUTPA claims were previously dismissed with prejudice.  (*Id.*).  Finally, the Rouse Defendants argue that Plaintiffs' state law antitrust claims are interpreted consistent with federal law and fail for the same reasons.  (*Id.* at 22-23).

### 2.  The Opposition

Plaintiffs oppose, arguing throughout that a short, plain statement of their claims is all that is required to survive a Rule 12(b)(6) motion.  (Doc. 164 at 3).

More specifically, Plaintiffs first represent that the Rouse Defendants have stated to co-conspirators that Izzo's "produced substandard product and was extremely litigious," giving rise to a claim for product defamation.  (*Id.*).  Plaintiffs contend that these statements are false, as Izzo's sole prior lawsuit concerning the recipe book was "100% correct," and Rouse's desire to put Izzo's

in its stores belies any contention that Rouse's believed Izzo's product to be "substandard." (*Id.* at 3-4). Plaintiffs also argue that the same allegations give rise to a claim for product disparagement and resulted in Izzo's exclusion from Juban Crossing. (*Id.* at 4-5).

Next, Plaintiffs argues that they have pled malice sufficient to support a claim of tortious interference with a contract, given Rouse, Jr.'s statement that Izzo's would "never make a dollar off of [him]!" and the Rouse Defendants' acknowledgement in prior filings that "the incident" involving the recipe book was extremely embarrassing. (*Id.* at 5; *see also* Doc. 13 at 2). Plaintiffs argue that, as a result of this ill will, Rouse's "demanded that Juban and Keller cancel a signed Letter of Intent to facilitate Rouse's evil plan" and also "lied [to] and coerced other developers" like "Mosley, Long Farms, Victory Berryland, and others." (Doc. 164 at 5-6). Plaintiffs claim that Rouse's is able to dictate and demand restrictions due to its size. (*Id.* at 6).

Next, Plaintiffs argue that their trademark infringement claim is "alive" as law of the case and that arguments to the contrary should be rejected. (*Id.* at 7). Plaintiffs also contend that they have stated a claim for conspiracy based on the aforementioned "embarrassment" and statement of Rouse, Jr. (*Id.*).

Plaintiffs then turn to their RICO claim, arguing that the schemes to bribe an Izzo's employee to steal the recipe book, to exclude Izzo's from Juban Crossing, and to "illegally use Izzo's trade secrets," constitute racketeering activity under RICO. (*Id.* at 8). Plaintiffs contends that the scheme to steal the recipe book violated the Travel Act via Rouse, Jr.'s act of state law commercial bribery. (*Id.* at 8-9). The scheme involving Juban Crossing is alleged to have violated the wire fraud statute, as the scheme involved the making of false statements over interstate wires. (*Id.* at 9-10). Finally, Plaintiffs argue that the unlawful use of trade secrets affecting interstate commerce is racketeering activity under RICO. (*Id.* at 10-11). Plaintiffs argue that they have

shown a pattern of activity that is "related and continuous," as the activity was all "conducted and carried out by Rouse[,] Jr. for the purpose of retaliating and harming the Plaintiffs after they refused to acquiesce to Rouse[,] Jr.'s request to franchise Izzo's in his grocery stores." (*Id.* at 11-12). Plaintiffs maintain that the pattern is "open-ended," as the trade secret violations "continue unabated." (*Id.* at 12). Plaintiffs also address several other of the Rouse Defendants' "scattershot" arguments. (*Id.* at 12-15).

With respect to an alleged wrongful conversion claim, Plaintiffs contend that the Rouse Defendants "wrongfully argue[]" that a trade secret and trademark cannot be wrongfully converted and that the "conversion continues until the conversion stops." (*Id.* at 15).

Plaintiffs then address their antitrust claims. They argue that the Court should consider the "aggregate effect of the multiple agreements that eliminate [Izzo's and LIT Pizza] from several developments, not just one" and the fact that, if these restaurants were "allowed in these 4 developments, that would create 8 more stores for consumers, and promote competition in the market." (*Id.* at 16). Plaintiffs argue that "Rouse's used its size and leverage to create both horizontal and vertical conspiracies in restraint of trade, which is exactly what the antitrust laws are created to prevent[.]" (*Id.* at 16-17). However, Plaintiffs later contend that, "[b]ecause the conspiracies and contracts are between Rouse's and the other defendants/developers, they are not on the same level, so the here the plaintiffs [sic] allege a vertical level conspiracy between Rouse's and the developers." (*Id.* at 17).

Plaintiffs maintain that Rouse's is the largest grocery store chain in Louisiana and possesses the largest market share "among grocers, second only to Walmart, (which sells much more than groceries)." (*Id.* at 18). Plaintiffs contend that this gives Rouse's monopoly power, permitting it to "set prices at its choosing," buy land for new stores, and lease from "anyone whom

it wishes." (*Id.*). Plaintiffs also contend that Rouse's "has no barriers to entry," but "opening a grocery store has a high level of barriers to entry." (*Id.*).

Plaintiffs further argue that the conspiracies were "reduced to writing in leases and deed restrictions," and that such leases and restrictions "can be found across Louisiana barring Izzo's and its affiliates from entry while Rouse's enjoys all the growth it wants by virtue of its monopoly." (*Id.*). Plaintiffs also argue that the agreements are evidenced by "the economic interests" of Defendants, the "close relationships" among them, Defendants' "concerns about the competitive threat that Izzo's application posed to the Defendants"; the history and anticompetitive practices of Rouse's, and the timing of Defendants' "various anticompetitive actions." (*Id.* at 19). Plaintiffs contend that they have been harmed by Rouse's actions, and consumers are harmed "because customers cannot find Izzo's or Lit Pizza." (*Id.* at 18). Plaintiffs argue that Defendants' conduct is both *per se* anticompetitive and that it violates the rule of reason. (*Id.* at 19-20). Plaintiffs maintain that any benefits flowing from Defendants' "restraints of trade" can be accomplished by less harmful means. (*Id.* at 21).

### 3. The Reply

The Rouse Defendants' Reply generally reiterates arguments previously made. (Doc. 172 at 1-6). They contend that the Court is free to reconsider and reverse its prior ruling on "the trademark claim" "for any reason it deems sufficient." (*Id.* at 1 n.1). They also reiterate that statements that Izzo's produced "substandard product" or was "extremely litigious" are purely expressions of opinion and cannot support a claim of defamation. (*Id.* at 2). The Rouse Defendants further argue that the Second Amended Complaint contains no wrongful conversion claim and that any claim for misappropriation of trade secrets based on events in 2012 had prescribed when the instant action was filed in 2016. (*Id.* at 2-3 & n.7). The Rouse Defendants also argue that Plaintiffs

have not alleged sufficient facts to plausibly suggest a RICO conspiracy, either with respect to an underlying agreement or predicate acts. (*Id.* at 3-4). The Rouse Defendants further contend that several of the predicate acts undergirding the conspiracy had prescribed by the time this suit was filed. (*Id.* at 4).

### B. Berryland

In its Motion, Berryland argues that the restrictive covenants in its lease agreements are common, lawful provisions and that the Second Amended Complaint makes virtually no allegations against Berryland. (Doc. 139-1 at 2-4). Berryland then addresses specific causes of action, contending first that Plaintiffs fail to allege that Berryland acted with "actual malice," as is necessary to support a tortious interference claim. (*Id.* at 5-6). Berryland next addresses Plaintiffs' antitrust claims, arguing that they have failed to adequately allege: (1) any facts in support of a *per se* unreasonable horizontal conspiracy among competitors at the same level; (2) that any vertical conspiracy had anticompetitive effects; (3) that Berryland had a significant share of the food sales market, a "dangerous probability" of achieving monopoly power in that market, or the specific intent to monopolize that market; and (4) any facts in support of a price discrimination claim. (*Id.* at 6-16). Next, Berryland claims that any "unfair competition" claim based on trademark violations does not involve Berryland. (*Id.* at 16). Finally, Berryland argues that, because Plaintiffs' underlying claims fail, there is no viable state law conspiracy claim. (*Id.* at 16-17).

Plaintiffs argue that Berryland's Motion is "absurd and completely lacking in any legitimate argument" and that Berryland was "well aware that Rouse'[s]" participated in a larger practice of excluding Izzo's and its affiliates from developments other than Berryland." (Doc. 168 at 1-2). Plaintiffs contend that Berryland has admitted to engaging in conspiracies in restraint of trade by executing lease provisions prohibiting Plaintiffs from leasing in "desired developments."

(*Id.* at 2). Plaintiffs argue that Berryland is liable because Rouse's "could not have carried out their intent to abolish Izzo's without the necessary cooperation from developers, each and every one." (*Id.*).

Plaintiffs further maintain that "[t]he defendants, Rouse's and Berryland, acted with ill-will and ill-motive as they have admitted . . . that getting caught with the recipe book caused them great embarrassment and anger." (*Id.* at 6). Plaintiffs clarify, however, that they are not pursuing wrongful conversion, tortious interference, or product defamation claims against Berryland "except as co-conspirators." (*Id.*). Concerning their RICO claim, Plaintiffs reiterate arguments made in opposition to the Rouse Defendants' Motion. (*Id.* at 7-14).

Concerning their antitrust claims, Plaintiffs allege that, by entering into an agreement with Rouse's, which competes with Izzo's, Berryland created "both horizontal and vertical restraints," although Plaintiffs again acknowledges that, "[b]ecause the conspiracies and contracts are between Rouse's and the other defendants/developers, they are not on the same level, so the here the plaintiffs [sic] allege a vertical level conspiracy between Rouse's and the developers." (*Id.* at 16). Plaintiffs' argument concerning their antitrust claims also generally tracks arguments made in opposition to the Rouse Defendants' Motion. (*Id.* at 16-20).

In reply, Berryland contends that most of the allegations in this action concern the Rouse Defendants' conduct, and "[t]here is nothing talismanic about repeatedly labeling [Berryland] a co-conspirator without substantive supporting allegations, and Plaintiffs cannot survive a motion to dismiss on allegations directed solely against another party." (Doc. 170 at 1-3). Regarding the antirust and civil conspiracy claims, Berryland contends that Plaintiffs wholly fail to address the arguments made in Berryland's Motion. (*Id.* at 1-2). Berryland also argues that, by acknowledging

that Izzo's and Berryland are not competitors, Plaintiffs have foreclosed any argument that a horizontal conspiracy exists.  (*Id.* at 4).

### C.  The Creekstone Defendants

The briefing on the Creekstone Defendants' Motion is extremely similar to that on Berryland's Motion.  The Creekstone Defendants argue that the lease between Rouse's and Creekstone contains "standard" leasing provisions and exclusions that are in no way improper. (Doc. 140-1 at 2-3).  The Creekstone Defendants note that most, if not all, of the leases they execute with tenants exclude some competitive retailers by name.  (*Id.* at 3-4).  The Creekstone Defendants further argue that: (1) Plaintiffs fail to allege in support of their tortious interference claims that the Creekstone Defendants acted with "actual malice"; (2) the Second Amended Complaint contains no specific factual allegations that any Defendants engaged in anticompetitive activities, whether separately or as a group; (3) Plaintiffs fail to "detail" any "unfair competition" claim against the Creekstone Defendants; and (4) absent an underlying tort, Plaintiffs' state law conspiracy claims fail.  (*Id.* at 8-11).  Plaintiffs' Opposition largely tracks their opposition to Berryland's Motion; they again note that they are not pursuing wrongful conversion, tortious interference, or product defamation claims against the Creekstone Defendants "except as co-conspirators[.]"  (Doc. 165 at 4).

### D.  The Mosely Defendants

The briefing on the Mosely Defendants' Motion is extremely similar to that on Berryland's and the Creekstone Defendants' Motions.  The Mosely Defendants argue that Plaintiffs do not make "a single direct factual allegation of misconduct against the Mosely Defendants . . . and there are few, if any allegations that would actually link the purported conduct of Rouse's to the Mosely Defendants."  (Doc. 143-1 at 2).  The Mosely Defendants next observe that a state law civil

conspiracy claim requires both a showing of "intentional" or "willful" conduct and an underlying tort. (*Id.* at 3-4). The Mosely Defendants argue that "entering into a contract – even a contract with a restrictive covenant – is not an independent basis for a cause of action by a third-party [sic]." (*Id.* at 4). The Mosely Defendants further maintain that Plaintiffs' RICO claim, claims for product defamation and disparagement, claims for tortious interference, and claims for trademark infringement are based solely on conduct by the Rouse Defendants. (*Id.* at 5-7). The Mosely Defendants further argue that there are no plausible allegations that they possess monopoly power in the relevant market and that any claim against them must be a claim of a vertical restraint. (*Id.* at 8-9). ). Plaintiffs' Opposition largely tracks their opposition to the Motions by Berryland and the Creekstone Defendants; yet again, they state that they are not pursuing wrongful conversion, tortious interference, or product defamation claims against the Mosely Defendants "except as co-conspirators[.]" (Doc. 163 at 5). In reply, the Mosely Defendants reiterate arguments previously made. (*See generally* Doc. 171).

## IV. ANALYSIS

Briefing in this case has revealed that Defendants can be divided into two groups. One consists of Berryland, the Creekstone Defendants, and the Mosely Defendants (collectively the "Developer Defendants"), while the second consists of the Rouse Defendants. Where appropriate, the Court will address the parties' arguments as they apply against a particular set of Defendants. The Court turns first to Plaintiffs' antitrust claims.

### A. Antitrust Claims

The Second Amended Complaint raises against all Defendants claims for "conspiracy under [the] Sherman Act and restraint of trade in [the] transportation market" and "violation of federal and Louisiana antitrust laws, unfair practices, and unfair competition[.]" (Doc. 138 at 9,

14 (capitalization altered)).  Although this section of the Second Amended Complaint is structured somewhat confusingly and is sometimes repetitive, Plaintiffs purport to state claims under 15 U.S.C. §§ 1, 2, 13, 35, and 36.  (*Id.*).

### 1.  15 U.S.C. § 1

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  To state a claim under this provision, a plaintiff must show that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market."  *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007).  A "necessary ingredient" of a Section 1 conspiracy is "a showing of concerted action on the part of the defendants."  *Id.*  To establish concerted action, the plaintiff must show that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective.  *See id.*

Section 1 conspiracies are generally analyzed under the "rule of reason," which requires a court to analyze whether the particular agreement at issue in fact unreasonably restrains competition.  *Id.* at 411-12.  That is, under this rule, an agreement is only unlawful if the plaintiff shows that it actually had an adverse effect on competition.  *Id.* at 412.  However, some agreements among firms that compete with each other at the same level of the market (*i.e.*, "horizontal" agreements) are viewed as *per se* anticompetitive and generally do not require proof that the agreement was actually anticompetitive.  *See id.*

Plaintiffs' stance on whether this case involves horizontal agreements is unclear but, regardless, the only agreements alleged with any specificity in the Second Amended Complaint are between Rouse's and individual Developer Defendants, who are not competitors at the same

level of any market alleged. Plaintiffs' remaining allegations concerning "the close relationships among Defendants," their "economic interests," and the "timing" of their actions are vague and therefore unavailing. Therefore, the only agreements alleged with the necessary particularity are not "horizontal" agreements within the meaning of antitrust law, notwithstanding that the agreements may have had "horizontal effects" on Plaintiffs. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988) (stating that "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement" and noting that "all anticompetitive effects are by definition horizontal effects"); *see also Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 224 (5th Cir. 2001) (evidence of sponsors making separate agreements with PGA, but not among themselves, was "hub and spoke sort of proof" insufficient to establish a horizontal conspiracy). This case will be analyzed under the rule of reason, and Plaintiffs will ultimately be required to show an adverse effect on competition. *See PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010); *see also Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374 (5th Cir. 2014) (regardless of whether *per se* rule or rule of reason applies, "ultimate[] focus" of court's inquiry should be on the "competitive significance" of a restraint).

Here, the Court cannot conclude that Plaintiffs have adequately alleged that further proceedings will reveal meaningful evidence of anticompetitive effects. As Plaintiffs' multiple Oppositions make clear, their arguments of harm to competition are fundamentally that "customers cannot find Izzo's or Lit Pizza," depriving them of that option and causing them to pay higher prices. (Doc. 163 at 15; Doc. 164 at 18; Doc. 165 at 15; Doc. 168 at 17; *see also* Doc. 138 at 19 ("Consumers, who will all need food, have been deprived of food options as a direct result of Defendants' wrongful conduct.")). The Court doubts whether Plaintiffs' exclusion from a handful

of developments would constitute a plausible showing of the alleged "destruction" of their own businesses within the relevant markets (alleged to include retail food sales throughout an area at least as large as Louisiana). (Doc. 138 at 11, 13-14). However, antitrust laws exist to protect competition, not individual competitors, and even the total elimination of a competitor does not make a restraint unreasonable as long as "sufficient competitors remain to ensure that competitive prices, quality, and service persist." *See Marucci Sports, L.L.C.*, 751 F.3d at 376-77. Plaintiffs have made no non-conclusory, non-speculative allegations of anticompetitive effects within the relevant market, as Plaintiffs have chosen to broadly define it. Plaintiffs' claims under Section 1 therefore fail.

### 2. 15 U.S.C. § 2

Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempting to monopolize, or conspiring to monopolize "any part of the trade or commerce among the several States."

To prevail on a monopolization claim, a plaintiff must show that the defendant: (1) possesses monopoly power in the relevant market, and (2) willfully acquired or maintained that power. *Felder's Collision Parts, Inc. v. Gen. Motors Co.*, 960 F. Supp. 2d 617, 624 (M.D. La. 2013).

To prevail on an attempted monopolization claim, a plaintiff must show: (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1349, 197 L. Ed. 2d 522 (2017).

Finally, to state a claim for conspiracy to monopolize, the plaintiff must allege: (1) specific intent to monopolize, (2) the existence of a combination or conspiracy to monopolize, (3) an overt act in furtherance of the combination or conspiracy, and (4) an effect upon a substantial portion of interstate commerce. *Felder's Collision Parts, Inc.*, 960 F. Supp. 2d at 624.

In connection with monopolization claims, a plaintiff must provide an adequate, plausible definition of the relevant product and geographic markets. *See Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002); *see also id.* at 633 (favorably citing *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000), for proposition that, to survive a motion to dismiss, antitrust plaintiff must set forth facts sufficient to create an inference that defendant "had enough market power to create a monopoly"). Monopoly power under Section 2 requires "something greater" than market power under Section 1. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

None of the Developer Defendants are liable for monopolization or attempted monopolization of the retail food market, as there are no allegations that they participated in that market or came anywhere near achieving monopoly power in that market. Therefore, Plaintiffs' claims against them must be conspiracy claims. However, such conspiracy claims also require a showing of the "existence of a combination or conspiracy to monopolize" and that a defendant acted with "specific intent to monopolize." *Felder's Collision Parts, Inc.*, 960 F. Supp. 2d at 624. There are simply no factual allegations that would permit an inference that any of the Developer Defendants' individual leases with Rouse's constituted the joining of such a conspiracy with such an intent. Restrictive covenants in shopping center leases do not violate antitrust laws in and of themselves, (*see, e.g.,* Doc. 143-1 at 10 (collecting cases)), and virtually no other actions taken by any of the Developer Defendants are identified with particularity in the Second Amended

Complaint, much less any actions that evince an intent to monopolize. Indeed, Plaintiffs' own exhibits suggest that, after observing that Rouse's restrictive covenants prevented Izzo's from leasing a particular location, Mosely said that he would be "happy to put Izzo's in phase 3 across the street where the restrictions did not apply," (Doc. 138-6 at 1), while a Creekstone representative said that he would "send . . . info on Millerville" once it was "sketched," (Doc. 138-9 at 1). No claims under Section 2 lie against the Developer Defendants.

With respect to the monopolization claims against the Rouse Defendants, there is similarly no non-conclusory allegation of specific intent or conspiracy to monopolize the retail food services market. Plaintiffs themselves suggest that Rouse's has "facilitated the placement of one of Izzo's competitors in the same location that Izzo's was supposed to be in[.]" (Doc. 164 at 6; *see also* Doc. 138-9 at 2 (email attached to Second Amended Complaint noting that there was a "Moe's" at Juban Crossing already)). There are simply no factual allegations that transform the Rouse Defendants' alleged ill will into an intent to monopolize the retail food market.

Moreover, with respect to the monopoly power required to undergird a claim of monopolization or attempted monopolization, Plaintiffs' Opposition confirms that its allegations of monopoly power are based on Rouse's position as the "largest grocer in Louisiana." (Doc. 164 at 18). As the Eastern District of Louisiana has set forth at some length:

> A nonconclusory allegation that a defendant holds a predominant share of the relevant market will usually satisfy the monopoly power element of a monopolization claim. [*United States v. Grinnell,* 384 U.S. 563, 571 (1966)]; *U.S. Anchor Mfg. Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 999 (11th Cir. 1993) (principal measure of monopoly power is market share). The precise market share a defendant must control before it has monopoly power remains undefined, but, the case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of monopoly power. *See, e.g., Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (factfinder can infer monopoly power from an 80 percent market share); *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 n. 3 (8th Cir. 1994) (share of more than 80 percent sufficient); *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964,

981 (5th Cir. 1977) (71–76 percent share sufficient); *Int'l Audiotext Network v. Am. Tel. & Tel. Co.,* 893 F.Supp. 1207, 1217–18 (S.D.N.Y. 1994) (70 percent market share generally adequate at the pleading stage); *see also* ABA Section of Antitrust Law, Antitrust Law Developments 230–31 (7th ed. 2012) (collecting cases).

In contrast, courts almost never find monopoly power when market share is less than about 50 percent. *American Telephone & Telegraph Co. v. Delta Commc'ns Corp.,* 408 F.Supp. 1075, 1107 (S.D.Miss. 1976), *aff'd per curiam,* 579 F.2d 972 (5th Cir. 1978) (adopting district court opinion), *modified on other grounds,* 590 F.2d 100 (5th Cir.1979) (41% share of local prime time television market insufficient to subject television network to Section 2 monopolization scrutiny); *Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1250 (11th Cir. 2002) ("market share at or less than 50% is inadequate as a matter of law to constitute monopoly power"); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir.1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share"). The Fifth Circuit adheres to Judge Learned Hand's widely accepted rule of thumb that "while a 90 percent market share definitely is enough to constitute monopolization, 'it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.' " *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 (5th Cir. 1984) (citing *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945), *approved and adopted, American Tobacco Co. v. United States,* 328 U.S. 781, 811–14, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

Leading scholars concur that "it would be rare indeed to find that a firm with half of a market could individually control price over any significant period." 3 Areeda & Hovenkamp ¶ 532c, at 250 (2007). The Department of Justice agrees that "as a practical matter, a market share of greater than fifty percent has been necessary for courts to find the existence of monopoly power." Department of Justice Guide/Report, COMPETITION AND MONOPOLY: SINGLE–FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT 2008 WL 4606679 (D.O.J.), 24 (noting that the DOJ is not aware of any court that has found that a defendant possessed monopoly power when its market share was less than fifty percent).

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382–83 (E.D. La. 2013) (Vance, J.) (complaint inadequate where it contained "no specific allegations of a dominant market share and no allegations that allow such an inference").

The Second Amended Complaint's allegations of monopoly power are inadequate to support a claim of monopolization or attempted monopolization. Plaintiffs variously allege that Rouse's is "the largest grocer in Louisiana," with "over 50 stores," (Doc. 138 at 3), that Rouse's

market share "exceeds any other grocer in Louisiana," (*id.* at 10), that Rouse's is "one of the largest grocers in Louisiana," (*id.* at 15), and that the "Market Area, more so in Louisiana, are [sic] highly concentrated by [Rouse's]," which is "the primary grocer in Louisiana," (*id.* at 16). Plaintiffs' Opposition reiterates that Rouse's has monopoly power as "the largest grocery store chain in Louisiana[,] . . .possess[ing] the largest market share among grocers, second only to Walmart, (which sells much more than groceries)." (Doc. 164 at 18). The Second Amended Complaint also focuses on certain additional features of the "grocery" market. (*See, e.g.*, Doc. 138 at 17 (because demand for retail food services is inelastic, "it is easier for grocers and wholesalers to set prices collusively")).

Plaintiffs' allegations of market share are vague and often appear inconsistent. Moreover, the most specific numerical figure attached to Plaintiffs' allegations, *i.e.*, that Rouse's operates "over 50 stores," (Doc. 138 at 3), falls well short of plausibly suggesting monopoly power in a geographic market alleged to span at least the entire state of Louisiana.

Plaintiffs' focus on "grocers" as a yardstick for measuring Rouse's market power is also problematic. That is, the relevant product market ("retail food sales," including both grocers and restaurants and focusing in this case particularly on pre-cooked, ready-to-eat food, (*see* Doc. 138 at 14-15)), is defined to include Izzo's, which is a restaurant, not a grocer. Using "grocers" as the measure of monopoly power within this market omits restaurants like Izzo's and likely includes grocery stores lacking the "deli/food court" section that Rouse's has. (*Id.* at 15). As a result, Plaintiffs' allegations of market share, and accordingly of monopoly power or a "dangerous probability" of achieving monopoly power, are inadequate. *See Apani Sw., Inc.*, 300 F.3d at 628, 633. Plaintiffs' Section 2 claims fail.

### 3. 15 U.S.C. §§ 13, 35, and 36

15 U.S.C. § 13(a), the only subprovision of 15 U.S.C. § 13 that might arguably apply in this case, prohibits any person engaged in commerce from discriminating in price "between different purchasers of commodities of like grade and quality" where the effect of that discrimination is to substantially lessen competition or tend to create a monopoly. The Second Amended Complaint does not allege price discrimination or any of the elements necessary to support such a claim. (*See* Doc. 139-1 at 15). To the extent that such a claim is made, it must be dismissed as inadequately pled.

15 U.S.C. §§ 35 and 36 concern the availability of damages and fees available from local government entities, and those acting at their direction, in actions under the Clayton Act. They do not give rise to a cause of action.

### 4. "Unfair Competition"

The section of the Second Amended Complaint concerning Plaintiffs' antitrust allegations ends with a section entitled "unfair competition," which alleges that, by engaging in acts described earlier in the Second Amended Complaint, "Defendants have engaged in unfair competition in violation of the Sherman Act, Clayton Act, RICO, civil conspiracies, theft of trade secrets and infringement of trademarks." (Doc. 138 at 19).

The underlying claims discussed in this "unfair competition" section have been addressed or will be addressed elsewhere in this Ruling and Order, but Plaintiffs provide no legal basis for a standalone "unfair competition" claim and do not identify with particularity the facts upon which it is based. This claim adds nothing to Plaintiffs' lawsuit and will accordingly be dismissed.

### 5. State Law Antitrust Claims

Louisiana's antitrust laws are "virtually identical" to Sections 1 and 2 of the Sherman Act, and federal analysis of the Sherman Act is "persuasive, although not controlling." *HPC Biologicals, Inc. v. UnitedHealthcare of Louisiana, Inc.*, 2016-0585 (La. App. 1 Cir. 5/26/16), 194 So. 3d 784, 792-93, *reh'g denied* (June 21, 2016). Plaintiffs' federal antitrust claims fail, and neither the Court nor any party has identified any basis upon which their state law antitrust claims should be resolved differently. Plaintiffs' state law antitrust claims therefore fail.

### B. Civil Conspiracy Claims

The Court next considers Plaintiffs' state law conspiracy claims. Notably, according to the Second Amended Complaint as clarified by Plaintiffs' Oppositions, Plaintiffs' only remaining claims against the Developer Defendants are state law conspiracy claims. (Doc. 138 at 6-9; Doc. 138 at 6-9; Doc. 168 at 6; Doc. 165 at 4; Doc. 163 at 5).

Louisiana Civil Code article 2324 provides that anyone who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act. If a conspiracy is conceived and executed and injury results, the injured person has a cause of action against all of the conspirators, who may be held civilly liable for damage to a third party resulting therefrom. *Butz v. Lynch*, 97-2166 (La. App. 1 Cir. 4/8/98), 710 So. 2d 1171, 1174, *writ denied*, 98-1247 (La. 6/19/98), 721 So. 2d 473.

Article 2324 does not itself impose liability for a conspiracy: the "actionable element" is not the conspiracy, but rather the tort which the conspirators agree to perpetrate and "actually commit in whole or in part." *Id.* To demonstrate an Article 2324 conspiracy, a plaintiff must ultimately "provide evidence of the requisite agreement between the parties"; that is, the plaintiff must "establish a meeting of the minds or a collusion between the parties for the purpose of

committing wrongdoing." *Thomas v. N. 40 Land Dev., Inc.*, 2004-0610 (La. App. 4 Cir. 1/26/05), 894 So. 2d 1160, 1174. Though a conspiracy may be inferred from knowledge of the impropriety of actions taken by a co-conspirator, the plaintiff must prove "an unlawful act and assistance or encouragement that amounts to a conspiracy," and the assistance or encouragement must be "of such quality and character that a jury would be permitted to infer from it an underlying agreement and act[.]" *Id.* A conspiracy claim requires more than negligence: it requires either intentional or willful conduct. *Id.* at 1177-78.

The only specific allegations of agreement in this case concern lease agreements between Rouse's and the Developer Defendants. However, as each of the Developer Defendants correctly argue, restrictive covenants between a lessor and lessee are not themselves unlawful, tortious, or violative of antitrust law. (*See* Doc. 139-1 at 3 n.3; Doc. 140-1 at 2-3; Doc. 143-1 at 10 (collecting cases)). *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC* is not to the contrary, as that case considered whether, under Louisiana law, a restrictive covenant "ran with the land" even though it was not expressed in the land's "title documents," not the general appropriateness of such restrictions. 746 F.3d 1008, 1030-31 (11th Cir. 2014). Therefore, the parties' mere entry into leases containing restrictive covenants provides inadequate support for claims of a tortious conspiracy and does not constitute a sufficient "step" toward the completion of an underlying tort to support a plausible claim under Article 2324. Plaintiffs' remaining allegations of conspiracy are conclusory and do not rise to the level of "assistance or encouragement that amounts to a conspiracy[.]" *Thomas*, 894 So. 2d at 1174. Accordingly, Plaintiffs' state law conspiracy claims fail. The Court now turns to the remaining claims against the Rouse Defendants.

## C. Product Defamation and Disparagement

In this case, this Court previously noted that, under Louisiana law, a defamation claim requires: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher and (4) resulting injury." *K&F Rest. Holdings, Ltd. v. Rouse*, 2017 WL 465470, at *5 (M.D. La. Feb. 2, 2017) (citing *Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99); 737 So.2d 706, 715). Opinions are generally not actionable as defamation. *See Thompson v. Lee*, 38,930 (La. App. 2d Cir. 2004), 888 So. 2d 300, 304 (press release equating a doctor's behavior to "that found in the Soviet Union or third world countries" was non-actionable opinion). More specifically, an expression of opinion is actionable "only if it implies the existence of underlying facts ascertainable by a reasonable person with some degree of certainty, and the implied factual assertions are false, defamatory, made with actual malice, and concern another." *Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So. 2d 706, 717. Similarly, to prove a product disparagement claim, a plaintiff must plead "publication, with malice, of false allegations concerning the property or product, and the causing of pecuniary harm." *K&F Rest. Holdings, Ltd.*, 2017 WL 465470, at *5 (citing *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990)).

In Louisiana, "delictual actions," including those raising defamation claims, are subject to a prescriptive period of one year that begins running when injury is sustained. *See* Louisiana Civil Code article 3492; *Alexander v. Times-Picayune L.L.C.*, 2016-1134 (La. App. 4 Cir. 5/31/17), 221 So. 3d 198, 203, *reh'g denied* (June 27, 2017), *writ denied*, 2017-1322 (La. 11/6/17), 229 So. 3d 469. The burden of proving prescription generally lies with the party asserting prescription, but, when a claim has prescribed on its face, the burden shifts to the plaintiff to prove that his claim has not prescribed. *Alexander*, 221 So. 3d at 203.

Plaintiffs allege that Rouse's told the Developer Defendants that Izzo's produced substandard product and was "litigious" or "extremely litigious." (Doc. 138 at 5, 7). Preliminarily, these statements are expressions of opinion in vague and general terms that would not permit a reasonable person to ascertain the existence of underlying facts "with some degree of certainty." *Fitzgerald*, 737 So. 2d at 717. Plaintiffs' own exhibits suggest that Izzo's exclusion from the Mosely Defendants' development did not result from such statements or the Mosely Defendants' understanding of any underlying facts derived from them. (*See* Doc. 138-6 at 1 (Fernandez's affidavit stating that, during a March 2016 meeting, Russell Mosely expressed regret that he could not include Izzo's in a development because of Rouse's demand for a restrictive covenant, but he did not "know the reason" for the restriction and repeatedly asked Fernandez "what happened" between Rouse's and Izzo's)).

Moreover, despite Plaintiffs' assertion that these false statements were made "for certain" to each of the Developer Defendants, (Doc. 138 at 8), the only instance of defamation or disparagement alleged with any particularity in the Second Amended Complaint is the statement by Rouse, Jr. to Creekstone in 2012, (Doc. 138 at 5), which, in or around June 2013, allegedly resulted in Creekstone and Rouse's signing a lease agreement excluding Plaintiffs, (Doc. 138-5 at 8). This lawsuit was filed in April 2016, (*see* Doc. 1-1), far more than a year after the harm arising from this statement occurred. Plaintiffs' defamation and disparagement claims arising from these facts are therefore prescribed on their face, and Plaintiffs have not provided facts or argument meaningfully undermining this conclusion.[2] Therefore, these claims fail.

---

[2] Plaintiffs attach as an Exhibit to their Oppositions an April 2016 letter from the law firm representing the Rouse Defendants. (*See, e.g.,* Doc. 164-1). The letter states that Rouse's follows a "justifiable policy to locate only in shopping centers where it will not be at risk of baseless allegations from competing businesses." (*Id.*). The Court declines to consider this letter, which was not referenced in or attached to the Second Amended Complaint. In any event, the letter does not suggest that Rouse's made statements concerning this "policy" to any Developer Defendants during the events underlying this lawsuit. Plaintiffs also attempted to file a sur-reply arguing, in part, that all of their claims were "filed timely" and the Rouse Defendants failed to "mention or disprove . . . how these claims are

## D. Tortious Interference with Business Relations[3]

To prove tortious interference with business relations, a plaintiff must show that the defendant improperly and maliciously influenced others not to deal with the plaintiff. *See Muslow v. A.G. Edwards & Sons, Inc.,* 18708-CA (La. App. 2d Cir. 6/10/87), 509 So.2d 1012, 1020, *writ denied,* 512 So.2d 1183 (La. 1987). Louisiana jurisprudence views this cause of action with "disfavor" and has limited it by requiring a plaintiff to show that the defendant acted with actual malice. *Brown v. Romero,* 05–1016 (La. App. 3d Cir. 2/1/06), 922 So.2d 742, 747, *writ denied,* 06–0480 (La. 5/5/06), 927 So.2d 315; *JCD Marketing, Co. v. Bass Hotels and Resorts, Inc.,* 01–1096 (La. App. 4th Cir. 3/6/02), 812 So.2d 834, 841; *see also* George Denegre, Jr., *et al.*, *Tortious Interference and Unfair Trade Claims: Louisiana's Elusive Remedies for Business Interference*, 45 Loy. L. Rev. 395, 401 (1999) ("[T]here appear to be no recorded cases in which anyone actually has been held liable for the tort [of tortious interference with business relations]."). Additionally, it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party. *Bogues v. Louisiana Energy Consultants, Inc.*, 46,434 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1128, 1135 (claim failed for, *inter alia*, failure to describe "any conversation between a particular plaintiff/lessor and any particular entity with whom LEC was attempting to confect a business relationship").

---

continuing torts and have not prescribed." (Doc. 174-1 at 1). The Court denied leave to file a sur-reply, (Doc. 176), but it notes that the proposed sur-reply argued that the alleged torts were continuing "as you can purchase a burrito from Rouse's," which does not establish that individual instances of alleged defamation or disparagement constitute a continuing tort. *See, e.g., Scott v. Zaheri*, 2014-0726 (La. App. 4 Cir. 12/3/14), 157 So. 3d 779, 787 (publication of four anonymous letters constituted four "separate and distinct acts" of defamation, with particular damages flowing from each act, and did not "rise to the level of a continuing tort").

[3] Plaintiffs' Opposition characterizes this claim as "Tortious Interference With a Contract." (Doc. 164 at 5). The Second Amended Complaint, however, describes how the Rouse Defendants "tortiously interfered and continue to tortiously interfere with lawful business relations." (Doc. 138 at 8).

According to the Second Amended Complaint and attached exhibits, in 2011 or 2012, Izzo's signed a letter of intent to lease space at Juban Crossing but Rouse's demanded that Izzo's be "kept out," claiming in 2012 that Izzo's is "litigious" and produces a "substandard product." (Doc. 138 at 4-5; Doc. 138-5 at 2). Plaintiffs' tortious interference claims appear to be based on this incident as well as unspecified, undescribed incidents involving other developers. (*Id.* at 8-9; *see also* Doc. 164 at 5-7 ("Likewise, Rouse's lied and coerced other developers to exclude Izzo's from their developments. The numerous contracts, leases and deeds entered into by Rouse's all include a provision to exclude Izzo's. . . . Rouse's has interfered with business relations with Juban, Keller, Mosley, Long Farms, Victory Berryland, and others. Furthermore, other developers have heard of the restrictions that Rouse's has imposed on all of its agreements to exclude Izzo's and made it more difficult for Izzo's to find developers willing to rent space to Izzo's, despite the fact that Izzo's has always been a good tenant and provided an excellent product.")). Plaintiffs' Opposition also argues that Rouse's "interfered with the contract that Izzo's had with its employee, Patrick Dartez[.]" (*Id.* at 5).

Plaintiffs' tortious interference claims fail. The only such claims pled with any specificity and with respect to a particular business relationship or negotiation (rather than Plaintiffs' general business interests) are their claims concerning Dartez and Juban Crossing.[4] However, these events occurred in or before 2012, far more than a year before this action was filed in April 2016. The Rouse Defendants accordingly raise a prescription defense. (Doc. 148-1 at 7-8). Plaintiffs' Opposition does not argue that the prescriptive period was suspended or started later than these dates; rather, it obliquely suggests that the Rouse Defendants' torts are ongoing. (*See* Doc. 164 at 5-7). However, Plaintiffs' allegations of ongoing harm are conclusory and appear to rely on injury

---

[4] The Court reiterates that, as discussed *supra*, a lease containing a restrictive covenant is not inherently tortious.

to Plaintiffs' general business interests rather than particular business relations with a particular third party. Particularly given the "disfavored" status of tortious interference claims, the Court cannot find such a claim adequately pled.

### E. Conversion

Plaintiffs' Opposition purports to address a "wrongful conversion" claim. (Doc. 164 at 15). As the Rouse Defendants correctly observe, however, no conversion claim is raised in the Second Amended Complaint. (Doc. 148-1 at 4 n.16; Doc. 172 at 2-3; *see generally* Doc. 138). The Court accordingly declines to consider any such claim.

### F. Trade Name Infringement

The primary issues in a trade name infringement case are (1) whether the party seeking relief has a protectable proprietary right in the name it seeks to exclude others from using, and (2) if so, whether there has been an infringement of that right. *Gulf Coast Bank v. Gulf Coast Bank & Tr. Co.*, 94-2203 (La. 4/10/95), 652 So. 2d 1306, 1309.

The Second Amended Complaint contends that Rouse's use of "build your own" in connection with its burrito bars infringes on Plaintiffs' trade name of "roll your own." (Doc. 138 at 9). The previously-assigned district judge ruled that a prior iteration of the Complaint adequately stated a claim concerning the use of "build your own," "declin[ing] to make a determination on the inherent or acquired distinctiveness of ['roll your own']" and finding adequate the Complaint's allegations that Rouse's used "build your own" to cause confusion or mistake and deceive consumers about the origin of "such goods or services." (Doc. 31 at 11-12).

The Rouse Defendants invite the Court to reconsider this ruling, arguing that the Court is generally free to reconsider prior rulings. (Doc. 172 at 1 n.1); *see also Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727 (5th Cir. 2012) (under law of the case

doctrine, courts show "deference to decisions already made" but are free to reconsider and reverse interlocutory orders for "any reason [they] deem[] sufficient"; when a successor judge replaces another judge, the successor judge has the same discretion to reconsider the first judge's order). The substance of the Rouse Defendants' argument is that it is implausible that a customer would enter a Rouse's burrito bar and be confused about the source of the burritos, and "build your own" (the term actually used by Rouse's) is a generic, descriptive term not amenable to trademark or trade name protection regardless of how used. (Doc. 148-1 at 8-10); *see also Gulf Coast Bank*, 652 So. 2d at 1313 ("A generic term is the name of a particular genus or class of which an individual article, service or business is but a member.").

In *Gulf Coast Bank*, the Supreme Court of Louisiana opined that a generic term is not given trademark or trade name protection. 652 So. 2d at 1313. However, a "descriptive term," which "identifies a characteristic or quality of an article, service or business" and is not ordinarily protectable, may become protected "if it acquires a secondary meaning." *Id.* Among those generic terms listed as examples in the Restatement (Third) of Unfair Competition are "camera," "computer programming," "bank," "light" when used to describe beer, and "diet" when used to describe cola. Restatement (Third) of Unfair Competition § 15 (1995); *see also CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1026 (N.D. Cal. 2008) (ruling that "bottled at the source" was generic when referring to bottled water because the primary importance of the "mark" was to describe "the product itself" rather than the company that bottled it; comparing "bottled at the source" to "disinfectable nail files," "light beer," and "brick oven pizza"); 2 McCarthy on Trademarks and Unfair Competition § 12:20 (5th ed.) ("The distinction between highly descriptive terms and generic names is difficult to state in the abstract. The best that can be done conceptually is to observe that descriptive terms describe a thing, while generic terms name the thing. But in

applying this to actual words, one quickly realizes that there is only a fine line between describing and naming." (footnote omitted)).

The Court agrees with the Rouse Defendants. While the Court recognizes the importance of showing proper deference to the decision of the previously-assigned district judge, the Fifth Circuit has emphatically stated that a successor judge remains entitled to revise an interlocutory order for any "sufficient" reason. *Stoffels*, 677 F.3d at 727. The Court does not disagree with the prior ruling that "roll your own," the term that Plaintiffs seek to protect in this action, may be descriptive and therefore protected under certain circumstances. However, Plaintiffs must also make sufficient allegations of the infringement of their protected rights. *Gulf Coast Bank*, 652 So. 2d at 1309. Plaintiffs' allegations of infringement are that Rouse's use of "build your own" and Izzo's "proprietary information is intended to and is likely to cause confusion or mistake and is intended to and has deceived consumers as to the source of origin of such goods or services." (Doc. 138 at 9). Under Rule 12(b)(6), such an "unadorned, the-defendant-unlawfully-harmed-me accusation" and "formulaic recitation of the elements of a cause of action" will not do. *Iqbal*, 556 U.S. at 678. As the Rouse Defendants persuasively argue, their infringement of any rights in "roll your own" is alleged to arise from their use of a common, generic phrase ("build your own") describing the product itself and distinct from the mark to be protected. *See also Urgent Care Inc. v. S. Mississippi Urgent Care Inc.*, 289 F. App'x 741, 742, 744-45 (5th Cir. 2008) (reversing grant of preliminary injunctive relief that prevented defendants from using the mark "urgent care"; although "UrgiCare" mark was protectable, "urgent care" was a generic term, and plaintiffs could not "prevent use of the term by registering a similar-sounding, but differently spelled mark"). Thus, even assuming that "roll your own" may be entitled to protection, Plaintiffs have failed to

adequately allege that the Rouse Defendants' use of the generic phrase "build your own" is infringing. Plaintiffs' claims of trade name infringement must be dismissed.

### G. Civil RICO

RICO makes it illegal for any person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO further prohibits conspiring to violate the aforementioned provision. 18 U.S.C. § 1962(d).

Civil RICO claims have three common elements: "'(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 523–24 (5th Cir. 2016) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)). "'A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity.'" *Id.* at 524 (quoting *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009)). The predicate criminal acts can be violations of either state or federal law. *Id.* (citing *St. Germain*, 556 F.3d at 263).

"'Predicate acts are "related" if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Bordelon v. Wells Fargo Fin. Louisiana, LLC*, 2018 WL 2717521, at *2 (E.D. La. June 6, 2018) (citing *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993)). "To establish continuity, plaintiffs must prove 'continuity of racketeering activity, or its threat.'" *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). "This may be shown by

either a closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242). Where alleged RICO predicate acts are "part and parcel" of a single, otherwise lawful transaction, a "pattern of racketeering activity" has not been shown. *Castrillo v. Am. Home Mortg. Servicing, Inc.*, 670 F. Supp. 2d 516, 530 (E.D. La. 2009) (Vance, J.) (citing *Word of Faith*, 90 F.3d at 123) (further ruling that it was immaterial to analyzing continuity that, had the defendants successfully "submitted their forgery," the "fraud would have continued until the note was satisfied"; RICO concerns long-term criminal conduct, not the long-term consequences of isolated or sporadic conduct).

The core of a civil RICO conspiracy claim under 18 U.S.C. § 1962(d) is "an agreement to commit predicate acts," and a complaint alleging such a claim, "at the very least, must allege specifically such an agreement." *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995) (affirming dismissal of civil RICO conspiracy claims where plaintiff had only conclusorily alleged that defendants had "conspired"); *see also Snow Ingredients, Inc.*, 833 F.3d at 526 (affirming dismissal of civil RICO conspiracy claims where complaint alleged that attorney defendants should have known that their conduct was unlawful but failed to allege agreement between them).

The Second Amended Complaint raises a civil RICO conspiracy claim against Rouse, Jr. via Rouse's, which Plaintiffs claim is a RICO "enterprise." (Doc. 138 at 6). Specifically, Plaintiffs contend that Rouse, Jr. "agreed" to violate RICO on three separate occasions, in violation of 18 U.S.C. § 1962(d), as part of three separate "schemes": the scheme "to bribe an Izzo's employee to steal its recipe book," the scheme "to exclude Izzo's from the Juban Crossing shopping center," and the scheme to illegally use Izzo's trade secrets, *i.e.,* its recipes. (*Id.* at 4-6). The Rouse Defendants argue that Plaintiffs have failed to adequately allege a pattern of predicate acts or a

criminal enterprise, the "continuing threat" posed by that enterprise, or the identity or roles of other participants in the enterprise. (Doc. 148-1 at 11-12).

Plaintiffs' RICO claim fails. Most significantly, the claim is expressly styled only as a conspiracy claim, but the Second Amended Complaint does not adequately allege the identities of Rouse, Jr.'s co-conspirators, the content or nature of the agreement they entered into, or the circumstances under which they entered into it. *Crowe*, 43 F.3d at 206; *Snow Ingredients, Inc.*, 833 F.3d at 526. Plaintiffs' Opposition re-iterates that its RICO claim is brought under "§ 1962(d), the conspiracy provision," and it argues that "Rouse[,] Jr. conspired with his store managers to steal the burrito recipes." (Doc. 164 at 13 n.10). However, although the Second Amended Complaint refers to unnamed "employee conspirators," the most specific allegation concerning them is that Rouse, Jr. "directed some of his store managers" in Lafayette to approach Dartez with an offer to defect. (Doc. 138 at 3). This falls short of specifically and plausibly alleging agreement supporting a RICO conspiracy. Moreover, Plaintiffs' allegations of a conspiracy (between Rouse, Jr. and his managers or Dartez) are limited to a single alleged crime in 2011 or 2012; there is no meaningful suggestion that the managers or Dartez conspired "to violate any of the provisions of [18 U.S.C. § 1962(c)]," by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." *Crowe*, 43 F.3d at 206; *see also Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140-41 (5th Cir. 1992) (complaint deficient for failure to allege facts "implying any agreement involving each of the Defendants to commit at least two predicate acts"; citing favorably similar standards of First, Second, and Third Circuits); *Ellis v. Warner*, 2017 WL 634287, at *12 (S.D. Fla. Feb. 16, 2017) (in Eleventh Circuit, RICO conspiracy may be proved by showing defendant's agreement as to an "overall objective" or to commit two predicate acts). Especially damning is the lack of specific allegations that anyone

other than Rouse, Jr. participated in or agreed to participate in the only "continuous" RICO violation alleged, *i.e.*, the continuing possession and use of Izzo's trade secrets.  *See Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016) ("continuity" requirement keeps civil RICO "focused on the long term criminal conduct Congress intended it to address, and prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law" (citations and quotation marks omitted)).  Moreover, as discussed *supra*, there are no non-conclusory allegations that any of the Developer Defendants conspired with any of the Rouse Defendants to engage in unlawful activity, much less an ongoing pattern of unlawful activity.

Some of the alleged predicate offenses are also insufficiently pled.  For example, Plaintiffs contends that the circumstances of the "bribe" violate the Travel Act, 18 U.S.C. § 1952, but the Rouse Defendants correctly observe that this crime requires travel in interstate or foreign commerce or the use of the mail or a "facility" in interstate commerce.  This element is generally not difficult to prove.  *See United States v. Rodriguez-Cruz*, 681 F. App'x 312, 313 (5th Cir. 2017) (cell phones are "facilities of interstate commerce," and even wholly intrastate use of a cell phone can satisfy jurisdictional "commerce" element of federal crimes); *BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 56 F. Supp. 2d 14, 53 (D.D.C. 1999), *aff'd in part, rev'd in part on other grounds and remanded sub nom. BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168 (D.C. Cir. 2000) ("use of a facility in commerce" includes interstate wire transfers and use of mail, telephone, or telegrapy).  However, Plaintiffs do not allege the use of such a facility in connection with this offense.  Particularly, Plaintiffs appear to incorrectly believe that it suffices to allege that Rouse's purchases supplies from out of state, (Doc. 138 at 4; Doc. 164 at 9), without alleging that travel, mail, or a facility of interstate commerce was used in connection with this alleged crime.

*Cf. United States v. Marek*, 238 F.3d 310, 320 (5th Cir. 2001) (to satisfy "commerce" element, "the *facility,* not its use, is what must be 'in interstate or foreign commerce.'").

Similarly, even if Rouse, Jr. claimed over interstate wires that Izzo's made "substandard" product and was "litigious," and even if one or more of these statements can be considered "false," *see supra*, the contours of any broader "scheme or artifice to defraud" in connection with Juban Crossing are only vaguely alleged. *See United States v. Brown*, 459 F.3d 509, 518 (5th Cir. 2006) (elements of wire fraud are "(1) the formation of a scheme or artifice to defraud, and (2) use of the wires in furtherance of the scheme"); *United States v. Bajoghli*, 785 F.3d 957, 962–63 (4th Cir. 2015) ("While fraud can be committed simply by engaging in an isolated transaction, a *scheme to defraud* requires a plot, plan, or arrangement that is executed by a fraudulent transaction. *See Black's Law Dictionary* 1546 (10th ed. 2014) (defining "scheme" as "[a] systemic plan; a connected or orderly arrangement"; or "[a]n artful plot or plan, [usually] to deceive others")." (emphasis in original)); *see also United States v. Locke*, 643 F.3d 235, 247 (7th Cir. 2011) ("We have previously noted that the crime comprehended by the mail and wire fraud statutes is the scheme to defraud, not just the isolated iterations of wire transmissions or mailings[.]").

In short, Plaintiffs' RICO conspiracy claim lacks sufficient non-conclusory allegations in support of the alleged agreements underlying it, of more than one of the continuing offenses that it is RICO's purpose to protect against, and indeed of any offense beyond Rouse's alleged continuing possession of trade secrets resulting from the theft of a recipe book. *See United States v. Case*, 309 F. App'x 883, 886 & n.2 (5th Cir. 2009) (suggesting that knowing possession of trade secrets without authorization and with the "inten[t] to convert" under 18 U.S.C. § 1832(a) is a continuing offense). The civil RICO claim therefore fails.

### H.  Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955).  The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Relying on *Great Plains* and other cases from this circuit, one district court in Texas articulated the standard as follows:

> When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir. 2004)* ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.") (internal citation omitted). However, a court may deny leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed.1990) (footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.,* 195 F.3d 765, 771 (5th Cir. 1999) ("A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.") (footnote omitted).

*Tow v. Amegy Bank N.A.*, 498 B.R. 757, 765 (S.D. Tex. 2013).  Finally, one leading treatise explains:

> As [] numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This

is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright, Arthur R. Miller, *et al*., *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Further leave to amend is unwarranted. Acting in accordance with "wise judicial practice," the Court previously afforded Plaintiffs multiple opportunities to amend their original Complaint. As a partial result, this case has been pending two years and has not advanced past the pleading stage. These multiple amendments strongly suggest that Plaintiffs have pled their best case. Moreover, the Court has expressly informed the parties that the Second Amended Complaint would be the final complaint in this case. (Doc. 136 at 1). Therefore, further leave to amend is unwarranted and will be denied.

V.    CONCLUSION

Accordingly, the Motions, (Docs. 139, 140, 143, 148), are GRANTED, and Plaintiffs' claims are DISMISSED WITH PREJUDICE. The Court will enter judgment consistent with this Ruling and Order.

Signed in Baton Rouge, Louisiana, on <u>July 24, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**